UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

U.S. DIST. COURT EAST DIST. WISC.
FILED
JUN - 1 2006
AT_____ O'CLOCK_____ M
SOFRON B. NEDILSKY

LONNIE L. JACKSON,

        Plaintiff,

v.                                Case No. 03-C-237

RAYMOND EVERETT,
MICHAEL MACGILLIS, and
DAN SLATTERY,

        Defendants.

## DECISION AND ORDER FOR JUDGMENT

On April 24, 2006, a trial to the court was conducted in this action. Five witnesses testified: the plaintiff, Lonnie L. Jackson ("the plaintiff" or "Jackson"), Captain Michael MacGillis ("defendant MacGillis" or "MacGillis"), Wendy Hernandez ("Ms. Hernandez"), Daniel R. Slattery ("defendant Slattery"or "Slattery"), and Raymond Everett ("defendant Everett" or "Everett"). The parties were thereafter afforded an opportunity to submit written memoranda in support of their respective positions on the plaintiff's claims. Having now considered the testimony, the exhibits, and the submissions of the parties, the court issues its decision in this action. This decision shall constitute the court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned

according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72.1 (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

## I. Parties and Witnesses

The plaintiff was arrested on October 26, 2001, and was taken to the Milwaukee County Criminal Justice Facility ("Jail"). At all times relevant, the plaintiff was a pretrial detainee at the Jail. Defendants MacGillis, Slattery and Everett were, at all times relevant, law enforcement officers with the Milwaukee County Sheriff's Department and were employed at the Jail. Ms. Hernandez was the nursing supervisor at the Jail.

## II. Excessive Force Claim

On October 31, 2001, the plaintiff pressed a button in his cell requesting medical assistance regarding his asthma. The plaintiff was removed from his cell, taken to in-pod treatment where he received medical assistance, and then returned to his cell. On the way back to his cell, the plaintiff testified that he was escorted by three officers: defendant Everett on the left, defendant Slattery on the right, and an unidentified officer in the middle. Once they arrived at the plaintiff's cell, he questioned the officers as to why he was in jail. The plaintiff testified that defendant Everett pushed him, causing the plaintiff to bump against his cell desk and fall down. The plaintiff testified that he then got up and defendant Slattery punched him in the chest causing the plaintiff to fall down. According to the plaintiff, his back and chest were injured and he suffered pain lasting ten days as a result of the incident. The plaintiff testified that, because of the incident, he saw two people that day for medical care.

AO 72A
(Rev.8/82)

Defendant Everett testified that once the plaintiff was back at his cell door, he asked the plaintiff to return to his cell. However, the plaintiff refused to do so. Defendant Everett and other deputies directed the plaintiff back into his cell. The plaintiff jumped back into a boxer's stance. Defendant Everett testified that he did not have to push or hit the plaintiff because he jumped backward into the cell. No report was written about the incident because it was considered a non-incident. Defendant Everett testified that he has never worked with defendant Slattery and that Slattery was not on the pod at the time of the alleged incident.

Defendant Slattery testified that he did not remember the incident and, after looking back at his work schedule for that day, determined that he was not even there. He worked the 6:00 a.m. to 2:00 p.m. shift and he would have been at roll call at 6:00 a.m., the approximate time of the incident.

Ms. Hernandez worked the morning shift at the Jail on October 31, 2001. She testified that she was very familiar with the plaintiff, that he was a chronic complainer and a difficult inmate. During the course of her testimony, Ms. Hernandez referred to a certified copy of the plaintiff's medical record. According to the nursing notes, on October 31, 2001, at approximately 5:30 a.m., the night shift nurse, while passing medication to the plaintiff, agreed to the plaintiff's request for a breathing treatment, which required a trip to the treatment room. (Pl.'s Ex. 5 at 38.) A deputy escorted the plaintiff to the treatment room and the nurse started the breathing treatment. The plaintiff started yelling loudly at the deputy that he was not going back to his cell until he got an explanation as to why he was in jail. *Id.* The deputy tried to explain but the plaintiff became loud and anxious. *Id.* The nurse called the deputy at floor control and attempted to get the plaintiff to finish his breathing treatment. *Id.* Other deputies arrived and the plaintiff left the treatment room without any other problems.

3

Ms. Hernandez, referring to the plaintiff's medical record, testified that on October 31, 2001, at 6:00 a.m., the medical station received a call from the third floor deputy, stating that the plaintiff was complaining of chest pain. *Id.* The third floor nurse, along with several deputies, responded to the call and asked the plaintiff to come to a table outside of his cell to be examined. *Id.* His vital signs were elevated, but stable. *Id.* During this time, the plaintiff became irate, yelling at the nurse, telling her that she witnessed him being hit in the chest earlier by the deputies. *Id.* However, the nurse charted in her medical notes that she did not witness this happen. *Id.* She then left and reported this occurrence to Ms. Hernandez, her nursing supervisor. *Id.*

Later in the day on October 31, 2001, the plaintiff called Nurse Dorothy Greer, complaining of chest pain. (Pl.'s Ex. 5 at 49.) By this time, the plaintiff was locked in his cell for earlier disturbances and for poor behavior in the bullpen. *See infra.* at 6-7. Nurse Greer examined the plaintiff in his cell. The plaintiff complained of mid sternal chest pain from a supposed altercation with deputies earlier. (Pl.'s Ex. 5 at 49.) The nurse noted no swelling or bruising. *Id.* The nurse administered Motrin, an anti-inflammatory pain medication, and referred the plaintiff to the Jail nurse practitioner for further evaluation. *Id.* Nurse Practitioner Ellie Seymour examined the plaintiff in the medical section clinic area on October 31, 2001. The plaintiff stated that he was in an altercation with deputies earlier on the night shift and that they punched him with closed fists in the sternum, and that he was in pain. The nurse practitioner noted no swelling or discoloration over his sternum. *Id.* The plaintiff's lungs were clear, and his heart rate was normal and regular. *Id.*

The Due Process Clause "'protects a pretrial detainee from the use of excessive force that amounts to punishment.'" *Dorsey v. St. Joseph County Jail Officials*, 98 F.3d 1527, 1528 (7th Cir. 1996) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). In determining whether force

4

was excessive in a particular situation, the guiding inquiry is whether officials behaved in a reasonable way in light of the facts and circumstances confronting them. *Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996) (citing *Titran v. Ackman*, 893 F.2d 145, 147 (7th Cir. 1990)).

The plaintiff concedes that defendant Slattery should be "dismissed with prejudice because the plaintiff has admittedly been unable to meet his burden of proof on the issue of use of excessive force by Dan Slattery." (Pl.'s Post-Trial Brief at 1.) Accordingly, defendant Slattery will be dismissed as a defendant in this action.

Turning to the question of whether defendant Everett used excessive force against the plaintiff, I find defendant Everett, and his version of the October 31, 2001 incident, to be more credible than the plaintiff, and his version of the incident. Simply stated, I am not persuaded that the incident happened as the plaintiff said it did. Indeed, under oath in this court, Jackson self-assuredly identified Slattery as being one of the individuals who used excessive force against him. Yet, that was impossible because the evidence demonstrates that Slattery was not even present at the time of the incident. That Jackson would be so wrong about such a fundamental fact gives me little confidence that he is being truthful about other facts surrounding the incident. Furthermore, the plaintiff testified that he was injured because of the excessive force used against him that day and that he was in pain for ten days as a result of his injuries. Yet, the plaintiff was seen by Jail medical staff at least five times on October 31, 2001, and it was only on two of those occasions that he mentioned any injury from the incident. Moreover, although one nurse noted that Jackson's chest was tender to the touch, there was no indication of swelling, discoloration, or bruising.

In the end, I find defendant Everett's testimony that the plaintiff initially refused to return to his cell, that the plaintiff was directed back into his cell, and that the plaintiff then jumped into a

5

AO 72A
(Rev.8/82)

boxer's stance and backward into his cell, more credible than the plaintiff's version of the event. Simply stated, defendant Everett was a more credible witness. It is Everett's favorable credibility, weighed against the incredibility of the plaintiff, that thus leads me to find in favor of the defendants on this claim.

### III. Due Process Claims

### A. The October 31, 2001 Incident and the November 2, 2001 Disciplinary Hearing

On November 2, 2001, the plaintiff was a party to a disciplinary hearing at the Jail that arose from allegations that the plaintiff had violated certain Jail rules on October 31, 2001. The October 31, 2001, incident is described as follows:

> On 10/31/01 at approx 1510 hours Jackson was in CIU open waiting area. He was yelling loudly stating he did not like white people and he didn't care what people think. I informed him he was disrupting open waiting and that he needed to lock-in a cell. He stated, "Fuck you." "I'm not going in no cell." "I don't give a fuck." Jackson was escorted to a cell by Deps. Feinberg & Witer. After placed in a cell, Jackson kicked on door numerous times. Jackson was placed into ripps to be escorted to 4D for excessive lockins (Rule 226). Jackson had to be escorted to court by two deputies in ripps. Continued uncooperative and belligerent behavior. Escorted to 4D pending [ ].

(Pl.'s Ex. 3, Rules Violation Report at 1.) The plaintiff was charged with the following rule violations: (1) Rule # 202, Use of obscene language to jail staff; (2) Rule # 208, Disobeying orders from sworn staff; (3) Rule # 212, Committing any act that disrupts the orderly operation; (4) Rule # 225, Failure to follow directions of court deputies; (5) Rule # 303, Refusing an order to lock-in; and (6) Rule # 226, 4th level - in pod violation. *Id.*

At the November 2, 2001 hearing, the plaintiff requested that he be allowed to call his cell mate as a witness, even though the plaintiff's cell mate was not present at the time of the incident for which he was being disciplined. Defendant MacGillis, who was the hearing officer, denied the

6

AO 72A
(Rev.8/82)

Case 2:03-cv-00237-WEC   Filed 06/01/06   Page 6 of 15   Document 82

plaintiff's request. The charges against the plaintiff for violating Rules 202, 208, and 212 were sustained. The charges against the plaintiff for violating Rules 225, 303, and 226 were not sustained. The plaintiff was sentenced to six days in disciplinary confinement, receiving two days credit for time already served.

Defendant MacGillis was the hearing officer. His notes from the hearing state: "Per I/M - Deputy told him she could make sure he didn't get to court. Incident occurred in CIU - not in court. Did not occur in pod - occurred. Denies swearing." *Id.*

Defendant MacGillis testified that he conducted approximately ten to twelve hearings per week. He further testified that, despite the Bureau Directive which states that inmates have a right to have an opportunity to call witnesses, inmates were never afforded an opportunity to call witnesses and, according to MacGillis, such right was not called for in Jail procedure.

## B. The December 10, 2001 Incident and the December 13, 2001 Disciplinary Hearing

On December 13, 2001, the plaintiff was a party to a disciplinary hearing at the Jail that arose from allegations that the plaintiff, on December 10, 2001, had violated certain Jail rules. The December 10, 2001, incident is described as follows:

> Inmate was given 4th level 1 in-pod violation for making disrespectful comments to deputies. (226)
>
> During medication pass, inmate was given his inhaler at his cell door. He was ordered to give the inhaler back, but refused stating, "come get it." (208) Inmate's cell door was again approached in an attempt to retrieve the inhaler, but inmate again refused to give the inhaler to the deputy. Inmate was then informed that he would be moved to disciplinary pod 4D. Sergeant J. Novotny, Deputy E. Jackson and Deputy R. Nelson were taken from jail duties to assist. (212)

(Pl.'s Ex. 4, Rules Violation Report, at 1.) The plaintiff was charged with the following rule violations: (1) Rule # 226, 4th Level 1 in-pod violation; (2) Rule # 208, Disobeying verbal or written

7

orders from sworn staff; (3) Rule # 216, Misuse of authorized medication; and (4) Rule # 212, Committing any act that disrupts the orderly operation of the jail. *Id.* At the December 13, 2001 disciplinary hearing, the plaintiff was found guilty of all four charges. He received fifteen days disciplinary confinement with three days credit for time already served.

Deputy Kasta prepared a report concerning the December 10, 2001 incident, which states as follows:

> On Monday, December 10, 2001, I, Deputy Anthony Kasta #874 of the Milwaukee County Sheriff's Department – Detention Services Bureau was in duty uniform, assigned to pod 5C of the Milwaukee County Jail, 949 N. 9th Street, Milwaukee, WI 53233.
> 
> At approximately 1600 hours, Inmate Lonnie L. Jackson (male/black, date of birth 01/07/65) was locked in for making disrespectful comments to deputies on his return from court to the pod. Upon review of his tier card, it was discovered that this would be Jackson's 4th level 1 in-pod violation. (226 – 4th level 1 in-pod violation) Sergeant James Novotny was notified immediately and instructed me to have Jackson lock-in, he would review the lock-in and the possibility of a 4D move upon his arrival.
> 
> Nurse Kathy Bowen was on the pod at approximately 1640 hours for medication pass. As other inmates were receiving their medication, Jackson rang the emergency button in his cell. I could see him standing at his cell door, and asked Kathy if he receives medication. She stated that he gets an inhaler. After finishing the line of inmates with prescribed medication, Kathy locked her medication cart in the deputy bathroom and we approached Jackson's cell. After Kathy handed Jackson the inhaler, I told him to use the inhaler immediately and hand it back. Jackson took the inhaler, set it on the ledge next to him and stated, "You are going to have to come get it, come get it!" I instructed Jackson to return the inhaler to me, and again he refused. (208 – disobeying verbal or written orders from sworn staff) Jackson's cell door was then closed and Kathy and myself returned to the Deputy workstation. After retrieving her cart, Nurse Kathy verified from the inmate's medical sheet that he was not authorized to keep the inhaler in his cell. (216 – misuse of authorized medication) She then left the pod and Sergeant James Novotny was informed of the situation. At this time Sergeant Novotny instructed me to attempt again to retrieve the inhaler and inform Jackson of the consequences of him not returning it.

At 1700 hours while making a round, I stopped at Jackson's cell door and instructed him again to give me the inhaler. He refused, and stated that "someone will have to come get it." I told Jackson that he would be moved to 4D, and deputies would retrieve the inhaler if he did not comply immediately. He again refused, stating "I know how shit goes, you have to do a cell extraction and if it's done wrong and I get hurt, I'm gonna sue the county." I told him that if he gave me the inhaler, there would be no need for anyone to come get it. He stated again, "If I get hurt, I'll sue," ignoring my comments.

Sergeant James Novotny, along with Deputies Elbertroy Jackson and Robert Nelson were taken from other jail duties and arrived on the pod at approximately 1745 hours. Inmate Jackson was put into a R.I.P.P. restraint belt by Deputies E. Jackson and R. Nelson and escorted to the pod door. Near the pod door, Inmate Jackson was stopped so he could be searched. As I approached him to conduct the search, Deputy Nelson found two small inhalers in Jackson's shirt pocket. They were handed to Sergeant Novotny and put into a bag. Inmate Jackson stated, "I need those inhalers, and can carry them on me by law." He was told by Deputy Nelson that the inhalers would be taken down to 4D with his belongings. At approximately 1750 hours, I searched Inmate Jackson and he was escorted out of the pod by Sergeant Novotny and Deputies E. Jackson and R. Nelson. (212 – committing an act that disrupts the orderly operation of the jail)

Upon gathering Inmate Jackson's property in his cell, it was discovered that he was also in violation of other in-pod violations including; storing food or drinks other than unopened packages purchased through commissary (fruit), possession of excess linen, and possession of legal books. His personal property was delivered to pod 4D at approximately 1815 hours.

A rules violation report was submitted to pod 4D, and this report will be reviewed by Sergeant Novotny on December 10, 2001.

(Pl.'s Ex. 7.) A supplemental report on the incident, prepared by Sergeant James Novotny, states:

On Monday, December 10, 2001, I, Sergeant James Novotny, was in full duty uniform and assigned as the second shift supervisor of the fifth and sixth floors of the Milwaukee County Jail, located at 949 North 9th Street, Milwaukee, WI 53233. At approximately 1655 hrs. I received a call from Deputy Anthony Kasta, who was working in Pod 5C, informing me that he had an inmate on lock-in status awaiting a transfer to Pod 4D for several rules violations. During the medication pass with nurse Kathy Bowen, the inmate, Lonnie L. Jackson (m/b, 01/07/65) had been given his inhaler to use. Per medical instructions related by nurse Bowen, Jackson was then to give the inhaler back, where it would be kept on the medical cart. Jackson refused to give the inhaler back to either nurse Bowen or Deputy Kasta. Per the medical

section, Jackson possesses three inhalers, two of which he can keep on his person, but medical staff must keep the third.

I arrived on Pod 5C at about 1745 hrs., along with Deputies Robert Nelson and Elbertroy Jackson. We approached Jackson's cell (#33) and he was ordered to come to the door to comply with instructions to place him in RIPP restraints for the move to Pod 4D. Jackson complied with our verbal instructions and was properly placed into restraints. He was then searched by Deputy Kasta and escorted off the pod by Deputies Jackson, Nelson, and me. In the hallway of the fifth floor control, it was discovered that Jackson still had possession of his inhaler, which he held cupped in his hands. Jackson was told to give us the inhaler, but he refused. He stated it was his legal right to keep his inhaler and he would not give it up. I told Jackson that I would talk to the medical section about the inhaler, but that for the moment we had to take it. He refused again to give it up, clutching it tightly to make it difficult for us to take it from him. Jackson was stabilized against the wall outside of Pod 5C by Deputies Jackson, Nelson, and Daniel Hughes, allowing us to have enough control over him to enable me to remove the inhaler from his grasp. While he was stabilized against the wall, Jackson began trying to attract the attention of an attorney who was in cubicle #4 by swinging his head from side to side and shouting that we were using unnecessary force against him. As he was swinging his head from side to side, his glasses struck the wall and one of the lenses popped out of the frame. We were able to verbally de-escalate Jackson's level of tension, and he was escorted to Pod 4D. Jackson's three inhalers and the lens to his glasses were turned over to 4D deputy Beth Miers, with instructions to return the lens to Jackson when he had complied with jail policy of changing over into red clothing for disciplinary housing. I also instructed Deputy Miers to contact the medical section regarding the issue of Jackson's inhalers.

At about 1850 hrs. I contacted Deputy Brenda Falk in Pod 4D. Deputy Falk stated that the medical staff was called and had again said that Jackson was allowed only the two inhalers on his person, and that medical had to maintain control of the third (the one he had refused to give up.) She also stated that as of this time Jackson was refusing to cooperate with orders to change into red clothing.

Sergeant Bret Myers, supervisor of Pod 4D, was notified of all of the above.

(Pl.'s Ex. 8.)

Jail medical records indicate that the plaintiff was using three difference types of inhalers for treatment of his asthma: Azmacort 20GN, Serevnt, and Albuterol. (Pl.'s Ex. 5 at 25.) Only the Azmacort was marked on the prescription records as "keep on cart." *Id.* The term "has own" was

noted for the other two inhalers. *Id.* The plaintiff was allowed to keep on his person at least one inhaler medical device at all times. There are other references in the Jail medical records confirming that the plaintiff had at least one inhaler in his possession at all times. *Id.* at 16, 21.

Defendant MacGillis was the hearing officer at the plaintiff's December 13, 2001 disciplinary hearing. At the hearing, the plaintiff requested, but was not allowed, to call a witness from the Jail medical department to offer testimony regarding the identity of all medications that he had been issued and which of the medications could be kept on his person at all times. According to the plaintiff, a witness from the Jail's medical department could have offered relevant evidence pertaining to the charge of "misuse of authorized medications."

## C. Discussion

"A pretrial detainee cannot be placed in segregation as a punishment for a disciplinary infraction without notice and an opportunity to be heard; due process requires no less." *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002) (citing *Rapier v. Harris*, 172 F.3d 999, 1004-05 (7th Cir. 1999); *Mitchell v. Dupnik*, 75 F.3d 517, 524-25 (9th Cir. 1996)). Under *Wolff v. McDonnell*, 418 U.S. 539, 564-66 (1974), the following procedural protections are required when an inmate's liberty interest is at stake: (1) advance written notice of the disciplinary charges; (2) an opportunity to call witnesses and present documentary evidence, when doing so is not unduly hazardous to institutional safety or correctional goals; and (3) a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action. Furthermore, although the Court did not prescribe the following, the Court stated that, if institutional safety requires the omission of certain evidence at a disciplinary hearing, "it would be useful for the [hearing officer] to state [his] reason for refusing to

11

call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." *Id.* at 566.

In *Rapier*, 172 F.3d at 1005, which established in the Seventh Circuit a pretrial detainee's right to "some sort of procedural protection" before being punished, the court did not explicitly hold what the procedural protection would be. However, in reaching its holding, the court relied on *Mitchell v. Dupnik*, 75 F.3d 517 (9th Cir. 1996), stating that "[w]hether the actions of the defendants constituted punishment for Mr. Rapier's conduct while in confinement – punishment that could be imposed only with the sort of procedural protections contemplated by the decisions of our sister circuits in *Mitchell* and *Collazo-Leon* – involves factual questions that might well not be subject to resolution on summary judgment." *Id.* at 1006. In *Mitchell*, 75 F.3d at 525, the Ninth Circuit Court of Appeals held that the prison's blanket policy of forbidding inmates from calling witnesses on their behalf during disciplinary proceedings violated due process.

Defendant MacGillis testified that he did not recall whether the plaintiff requested a witness at either of his disciplinary hearings. However, defendant MacGillis also testified that, even if the plaintiff had requested a witness, he would have denied such a request because inmates did not have a right to call witnesses. Defendant MacGillis simply stated that the procedure in place at the Jail at that time was to not allow inmates to call witnesses. This, according to defendant MacGillis, was the procedure, in spite of the Bureau Directive stating otherwise.

The plaintiff requested his cell mate as a witness at his first disciplinary hearing, which took place on November 2, 2001. However, his cell mate was not present at the October 31, 2001 incident for which the hearing was being conducted. Such being the case, there is no way that defendant MacGillis's denial of the plaintiff's request to call his cell mate as a witness could have prejudiced

12

the plaintiff. The plaintiff's stay in segregation, an additional four days, would have been the same with or without the witness.

At his December 13, 2001 disciplinary hearing the plaintiff requested that he be allowed to call a witness from the Jail medical department to offer testimony regarding the identity of all medications he had been issued and which of the medications could be kept on his person at all times. According to the plaintiff, such witness from the Jail's medical department could have offered evidence pertaining to the charge of "misuse of authorized medications."

The plaintiff was prescribed three inhalers. Apparently, he was allowed to keep two of them with him, while the third inhaler was kept on the cart. Deputy Kasta's report of the December 10, 2001 incident states that the basis of the plaintiff's "misuse of authorized medications" charge was, "[a]fter retrieving her cart, Nurse Kathy verified from the inmate's medical sheet that he was not authorized to keep the inhaler in his cell." (Pl.'s Ex. 7 at 1.) Sergeant Novotny's supplemental report of the incident is much the same. That report states: "[p]er the medical section, Jackson possesses three inhalers, two of which he can keep on his person, but medical staff must keep the third." (Pl.'s Ex. 8.) The supplemental report also states: "Deputy Falk stated that the medical staff was called and had again said that Jackson was allowed only the two inhalers on his person, and that medical had to maintain control of the third (the one he had refused to give up)." *Id.* In other words, Jail staff was aware that the plaintiff was allowed to keep inhalers with him; however, the incident for which Jackson was being disciplined involved the third inhaler, which the plaintiff was not allowed to keep with him, and which he refused to give up. In light of such fact, the sought-after testimony of an unidentified member of Jail medical staff would not have materially affected the outcome of the plaintiff's disciplinary hearing.

13

Although inmates have a due process right to call witnesses at their disciplinary hearings when doing so would be consistent with institutional safety and correctional goals, there is no right to call witnesses whose testimony would be irrelevant, repetitive, or unnecessary. *Piggie v. Cotton*, 344 F.3d 674, 677 (7th Cir. 2003); *Forbes v. Trigg*, 976 F.2d 308, 317-18 (7th Cir. 1992). Moreover, a violation of the right to call witnesses will be considered harmless unless there is evidence that the testimony could have aided the prisoner's defense. *See Piggie*, 344 F.3d at 678; *see also McGuinness v. Dubois*, 75 F.3d 794, 798-800 (1st Cir. 1996) (declining to decide whether a blanket policy denying live witnesses to inmates in segregation violated due process because inmate did not demonstrate how proffered testimony would have aided his defense).

As noted previously, the presence of the plaintiff's cell mate at the first disciplinary hearing and the presence of a Jail medical staff member at the second disciplinary hearing would not have materially affected the outcome of those hearings. Such being the case, even though Jackson had a due process right to call witnesses at his disciplinary hearings (that is, assuming his doing so would have been consistent with institutional safety), his due process rights were not violated in this case by defendant MacGillis's denial of Jackson's requests to call the afore-identified witnesses. This is because MacGillis's refusal to allow Jackson to call such witnesses was harmless.[1] Accordingly, I find in favor of the defendants on the plaintiff's due process claims.

---

[1] This court finds that Jackson's due process rights were not violated because MacGillis's refusal to allow Jackson to call his witnesses was harmless. However, I find it necessary to reiterate, especially in light of MacGillis's testimony that the procedure in place at the Jail, at least at that time, was to not allow inmates to call witnesses at disciplinary hearings, that the due process clause does require inmates to have an opportunity to call witnesses at a disciplinary hearing, when doing so is not unduly hazardous to institutional safety or correctional goals, and when the witness's testimony is not irrelevant, repetitive, or unnecessary. The Supreme Court and the Seventh Circuit have so held. *Wolff*, 418 U.S. at 566; *Piggie*, 344 F.3d at 677.

14

In conclusion, and for all of the foregoing reasons, judgment will be entered in favor of the defendants and against the plaintiff, and this action will be dismissed.[2]

## ORDER

**NOW THEREFORE IT IS ORDERED** that judgment be entered in favor of defendants Raymond Everett, Michael MacGillis, and Dan Slattery, and against plaintiff Lonnie L. Jackson;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the clerk of court shall enter judgment accordingly.

**SO ORDERED** this 1st day of June 2006, at Milwaukee, Wisconsin.

WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

---

[2] At the request of the court, Attorney Jerold V. Fennell agreed to represent the plaintiff, Lonnie L. Jackson, in this action. The court extends its deep appreciation to Attorney Fennell for agreeing to do so. Although the plaintiff did not ultimately prevail on his claims, it was not due to any lack of effort on the part of Attorney Fennell. Indeed, Attorney Fennell's representation of Mr. Jackson was superb.